# EXHIBIT G

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

| | |
|---|---|
| _____ | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. |
| | ) |
| _____ | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: _____

*(Name of person to whom this subpoena is directed)*

❑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: | Date and Time: |
|---|---|
| | |

The deposition will be recorded by this method: _____

❑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

_CLERK OF COURT_

OR

_____          _____
*Signature of Clerk or Deputy Clerk*               *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____

_____ , who issues or requests this subpoena, are:

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**SCHEDULE A**
**TO SUBPOENA TO CHAITMAN LLP**

## I. TOPICS

1. The scope of authority of McCarter & English or any other attorney purporting to act on behalf of the NCSLTs, including (i) to execute a proposed consent judgment or consent order in connection with a CFPB enforcement action (whether filed administratively or in federal court) on behalf of the NCSLTs, (ii) in connection with the Investigation and/or Action, or (iii) to otherwise act on behalf of the NCSLTs;

2. The scope of authority of VCG (including Donald Uderitz), including the authority to select a representative or retain a law firm to execute a proposed consent judgment or consent order in connection with a CFPB enforcement action (whether filed administratively or in federal court), or otherwise act on behalf of the NCSLTs;

3. The legal opinion that was referenced on page 7 of *Plaintiff Consumer Financial Protection Bureau's Consolidated Response to Motions to Intervene*, dated Nov. 1, 2017 and filed in connection with the Action (Dkt. No. 54);

4. Any Notice and Opportunity to Respond and Advise ("NORA") letter issued by the CFPB to the NCSLTs, including the responses purportedly provided on behalf of the NCSLTs to such NORA letters;

5. Any actual or potential conflict between: (i) the Trust Related Agreements, and (ii) the Proposed Consent Judgment or any prior drafts of a proposed consent judgment or consent order related to the Investigation or Action;

6. The need to obtain approval from entities other than the NCSLTs (including any member of the Intervenor Group) to avoid or eliminate any actual or potential conflict between:

(i) the Trust Related Agreements, and (ii) the Proposed Consent Judgment or any prior drafts of a proposed consent judgment or consent order against the NCSLTs related to the Investigation or Action;

7.      The nature and extent of requirements for approval from entities other than the NCSLTs (including any member of the Intervenor Group) to avoid or eliminate any conflict between:  (i) provisions in the Trust Related Agreements, and (ii) provisions in the Proposed Consent Judgment or any prior drafts of a contemplated consent enforcement action against the NCSLTs;

8.      The negotiation of the Proposed Consent Judgment;

9.      The effects the Proposed Consent Judgment would have on (i) the NCSLTs, including effects on their governance, revenue streams, and payment structures and priorities; (ii) VCG; (iii) the Noteholders, and (iv) the members of the Intervenor Group;

10.     Any request from VCG to Wilmington Trust Company to enter into the Proposed Consent Judgment or any other consent resolution of the Investigation with respect to the NCSLTs, including Wilmington Trust Company's decision declining to execute such a consent and VCG's response to Wilmington Trust Company's declination;

11.     Any request from VCG to McCarter & English to enter into the Proposed Consent Judgment or other consent to resolve the Investigation;

12.     Any analysis or communications that concern VCG's authority to issue directions to Wilmington Trust Company concerning the National Collegiate Master Student Loan Trust absent the consent of Ambac;

13.     VCG's involvement in McCarter & English's purported representation of the NCSLTs in connection with the Investigation and the Action;

14.     Wilmington Trust Company's refusal to execute the Proposed Consent Judgment, and VCG's response to Wilmington Trust Company's refusal;

15.     VCG's request to McCarter & English to enter into the Proposed Consent Judgment, including VCG's reasons and rationale for the request;

16.     Communications between Chaitman and BPA concerning the NCSLTs;

17.     Communications between Chaitman and the law firm of DiCello Levitt & Casey LLC concerning the NCSLTs, the Investigation, or the Action;

18.     Efforts to ascertain the authority of VCG or any law firm or entity purporting to act on behalf of the NCSLTs;

19.     The denial of Ambac Assurance Corporation's July 14, 2017 books and records request concerning the negotiation of the Proposed Consent Judgment;

20.     Chaitman's records, including billing records, concerning any work purportedly performed on behalf of the NCSLTs;

21.     The nature of Chaitman's, McCarter & English's, and BPA's engagements with the NCSLTs, including the extent to which Chaitman, McCarter & English, or BPA was engaged to advance the interests of the NCSLTs, the Noteholders, and Ambac.

## II. DEFINITIONS

1.      The term "Intervenor Group" refers to intervenors Ambac Assurance Corporation; GSS Data Services, Inc.; Waterfall Eden Master Fund, Ltd.; Waterfall Delta Offshore Master Fund, LP; Waterfall Sandstone Fund, LP.; Baldr Sherwood Fund, Inc.; One William Street Capital Master Fund, Ltd.; OWS ABS Master Fund II, LP; OWS COF I Master, LP; OWS Credit Opportunity I, LLC; OWS Global Fixed Income Fund (USD-Hedged), Ltd.; LibreMax Master Fund, Ltd.; LibreMax Value Master Fund, Ltd.; LibreMax MSW Fund, Ltd.; AG Mortgage Value Partners Master Fund, L.P.; AG TCDRS, L.P.; AG Pisgah, L.P.; AG Super RMBS, LLC; and AG Opportunistic Whole Loan Select, L.P.; Pennsylvania Higher Education Assistance Agency; Transworld Systems, Inc.; U.S. Bank, National Association; and Wilmington Trust Company.

2.      The term "CFPB" refers to plaintiff Consumer Financial Protection Bureau or the Bureau of Consumer Financial Protection, and its affiliates, assigns, predecessors, officers, directors, employees, agents, representatives, partners, contractors and anyone else acting or purporting to act on the CFPB's behalf.

3.      The term "Action" means *CFPB v. National Collegiate Master Student Loan Trust et al.*, No. 1:17-cv-01323-MN (D. Del.).

4.      The term "Investigation" means the investigation conducted by the CFPB and referenced in its complaint filed against the Trusts in *CFPB v. National Collegiate Master Student Loan Trust et al.*, No. 1:17-cv-01323-MN (D. Del.) (Dkt. 1).

5.      The term "Ambac" means Ambac Assurance Corporation.

6.      The term "Noteholders" refers to holders of Notes in the NCSLTs.

7.      The term "Notes" refers to the notes issued by the NCSLTs.

8.      The term "NCSLTs" refer to the defendants, the fifteen Delaware statutory trusts referred to as the National Collegiate Student Loan Trusts, which are the National Collegiate Master Student Loan Trust, NCSLT 2003-1, NCSLT 2004-1, NCSLT 2004-2, NCSLT 2005-1, NCSLT 2005-2, NCSLT 2005-3, NCSLT 2006-1, NCSLT 2006-2, NCSLT 2006-3, NCSLT 2006-4, NCSLT 2007-1, NCSLT 2007-2, NCSLT 2007-3, and NCSLT 2007-4.

9.      The term "Chaitman" refers to the law firm Chaitman LLP and its affiliates, member firms, assigns, predecessors, officers, directors, board members, employees, agents, representatives, partners, contractors and anyone else acting or purporting to act on Chaitman's behalf.

10.     The term "McCarter & English" refers to the law firm McCarter & English, LLP and its affiliates, member firms, assigns, predecessors, officers, directors, board members, employees, agents, representatives, partners, contractors and anyone else acting or purporting to act on McCarter & English's behalf.

11.     The term "DiCello Levitt & Casey" refers to the law firm DiCello Levitt & Casey LLC and its affiliates, member firms, assigns, predecessors, officers, directors, board members, employees, agents, representatives, partners, contractors and anyone else acting or purporting to act on DiCello Levitt & Casey's behalf.

12.     The term "BPA" refers to Boston Portfolio Advisors, Inc. and its affiliates, assigns, predecessors, officers, directors, board members, employees, agents, representatives, partners, contractors and anyone else acting or purporting to act on BPA's behalf.

13.     The term "VCG" refers to VCG Securities, LLC; VCG Owners Trust; VCG Special Opportunities Master Fund, Ltd.; NC Owners, LLC; NC Residuals Owners Trust; CeCe & Co. Ltd., LLC; Pathmark Associates, LLC; all employees, members, agents, consultants, and

all other persons acting or purporting to act on behalf of, or under the control of, each of the foregoing; Donald Uderitz; and Jorge Rodriguez-Lugo; and anyone else acting or purporting to act on VCG's behalf.

14.     The term "Proposed Consent Judgment" refers to the Consent Judgment that the CFPB submitted to the court for approval in the Action on September 18, 2017, and includes, without limitation, any prior drafts of the Proposed Consent Judgment as well as any prior drafts of any contemplated consent enforcement action against the NCSLTs.

15.     The term "Trust Related Agreements" refers to (1) agreements included within the definition of "Trust Related Agreements" set forth in the Trust Agreements, including the Trust Agreements, Indentures, and other agreements executed by the Owner Trustee; (2) agreements executed in reliance on agreements executed by the Owner Trustee (such as the McCarter & English retention letter), and (3) any "Basic Documents" as that term is defined in the Indentures, including servicing agreements.

16.     The term "Threshold Issues" refers to those Threshold Issues set out in the scheduling order dated November 29, 2018 entered in this Action (Dkt. 99).

17.     "Concerning" or "concern" mean in any way, directly or indirectly, constituting, alluding to, commenting on, comprising, considering, constituting, describing, discussing, evidencing, identifying, mentioning, pertaining to, referring to, regarding, relating to, relevant to, representing, showing, suggesting, underlying, or otherwise involving the subject matter of the specified topic.

18.     The words "and," "or," and "any" shall be construed as necessary to bring within the scope of these topics any information that otherwise might be construed to be outside the scope of any of them.

19.     The words "including," "include," or "includes" are used in their broadest sense and are not meant to be limiting.  Any list following these terms contains illustrative examples of the types of information covered by the above-listed topics, but the list is without limitation and does not constitute an exclusive, all-encompassing, or exhaustive listing of all information covered by each the topic.

20.     Use of a singular noun shall be construed to include the plural noun, and use of a plural noun shall be construed to include the singular noun.

21.     The use of a verb in any tense shall be construed as the use of that verb in all other tenses whenever necessary to bring within the scope of the topics information that might otherwise be construed to be outside their scope.

**SCHEDULE B**
**TO SUBPOENA TO CHAITMAN LLP**

## I. DOCUMENTS REQUESTED

All Documents and communications concerning the Investigation, the Action, and the Proposed Consent Judgment that relate to the Threshold Issues set forth in the Scheduling Order, including:

1.      Any information or communications exchanged between the CFPB, on the one hand, and VCG, McCarter & English, Chaitman, Dicello Levitt & Casey LLC, Boston Portfolio Advisors, or any other entities representing or purporting to represent the NCSLTs or VCG, or any of their principals or representatives, on the other hand;

2.      Any information or communications exchanged between McCarter & English, on the one hand, and VCG, Chaitman, Dicello Levitt & Casey LLC, Boston Portfolio Advisors, or any other entities representing or purporting to represent the NCSLTs or VCG, or any of their principals or representatives, on the other hand;

3.      The scope of authority of McCarter & English or any other attorney purporting to act on behalf of the NCSLTs, including (i) to execute a proposed consent judgment or consent order in connection with a CFPB enforcement action (whether filed administratively or in federal court) on behalf of the NCSLTs, (ii) in connection with the Investigation and/or Action, or (iii) to otherwise act on behalf of the NCSLTs;

4.      The scope of authority of VCG (including Donald Uderitz), including the authority to select a representative or retain a law firm to execute a proposed consent judgment or consent order in connection with a CFPB enforcement action (whether filed administratively or in federal court), or otherwise act on behalf of the NCSLTs;

1

5.      The legal opinion that was referenced on page 7 of *Plaintiff Consumer Financial Protection Bureau's Consolidated Response to Motions to Intervene*, dated Nov. 1, 2017 and filed in connection with the Action (Dkt. No. 54), and any drafts of the referenced legal opinion and any documents cited in the legal opinion;

6.      Any Notice and Opportunity to Respond and Advise ("NORA") letter issued by the CFPB to the NCSLTs, including the responses purportedly provided on behalf of the NCSLTs to such NORA letters;

7.      Any actual or potential conflict between: (i) the Trust Related Agreements, and (ii) the Proposed Consent Judgment or any prior drafts of a proposed consent judgment or consent order related to the Investigation or Action;

8.      The need to obtain approval from entities other than the NCSLTs (including any member of the Intervenor Group) to avoid or eliminate any actual or potential conflict between: (i) the Trust Related Agreements, and (ii) the Proposed Consent Judgment or any prior drafts of a proposed consent judgment or consent order against the NCSLTs related to the Investigation or Action;

9.      VCG's authority to issue directions to Wilmington Trust Company with respect to the NCSLTs in connection with the Investigation or Action, including with respect to the Master Trust, absent the consent of Ambac;

10.     Any request from VCG to Wilmington Trust Company to enter into the Proposed Consent Judgment or any other consent resolution of the Investigation with respect to the NCSLTs, including Wilmington Trust Company's decision declining to execute such a consent and VCG's response to Wilmington Trust Company's declination;

11.     Any request or instruction from VCG to McCarter & English to enter into the Proposed Consent Judgment or other consent to resolve the Investigation;

12.     Communications between Chaitman and BPA concerning the NCSLTs;

13.     Communications between Chaitman and the law firm of DiCello Levitt & Casey LLC concerning the NCSLTs, the Investigation, or the Action;

14.     Efforts to ascertain the authority of VCG or any law firm or entity purporting to act on behalf of the NCSLTs;

15.     The denial of Ambac Assurance Corporation's July 14, 2017 books and records request concerning the negotiation of the Proposed Consent Judgment;

16.     Chaitman's billing records concerning any work purportedly performed on behalf of the NCSLTs;

17.     Each different draft of a proposed enforcement action (including a proposed consent judgment or consent order, and any accompanying complaint or statement of factual findings) against the NCSLTs, including drafts communicated to or received from VCG and communications between the CFPB and VCG concerning the drafts or terms of a consent judgment or consent order; and

18.     The effects the Proposed Consent Judgment would have on (i) the NCSLTs, including effects on their governance, revenue streams, and payment structures and priorities; (ii) VCG; (iii) the Noteholders, and (iv) the members of the Intervenor Group; and

19.     The engagement letter between McCarter & English and Chaitman dated March 6, 2016, any drafts of such engagement letter, and any other engagement letters, whether in draft or final form, between McCarter & English and any of Chaitman, VCG, or any of their principals or representatives that relate in any way to the NCSLTs.

## II. DEFINITIONS

1.      The term "Intervenor Group" refers to intervenors Ambac Assurance Corporation; GSS Data Services, Inc.; Waterfall Eden Master Fund, Ltd.; Waterfall Delta Offshore Master Fund, LP; Waterfall Sandstone Fund, LP.; Baldr Sherwood Fund, Inc.; One William Street Capital Master Fund, Ltd.; OWS ABS Master Fund II, LP; OWS COF I Master, LP; OWS Credit Opportunity I, LLC; OWS Global Fixed Income Fund (USD-Hedged), Ltd.; LibreMax Master Fund, Ltd.; LibreMax Value Master Fund, Ltd.; LibreMax MSW Fund, Ltd.; AG Mortgage Value Partners Master Fund, L.P.; AG TCDRS, L.P.; AG Pisgah, L.P.; AG Super RMBS, LLC; and AG Opportunistic Whole Loan Select, L.P.; Pennsylvania Higher Education Assistance Agency; Transworld Systems, Inc.; U.S. Bank, National Association; and Wilmington Trust Company.

2.      The term "CFPB" refers to plaintiff Consumer Financial Protection Bureau or the Bureau of Consumer Financial Protection, and its affiliates, assigns, predecessors, officers, directors, employees, agents, representatives, partners, contractors and anyone else acting or purporting to act on the CFPB's behalf.

3.      The term "Action" means *CFPB v. National Collegiate Master Student Loan Trust et al.*, No. 1:17-cv-01323-MN (D. Del.).

4.      The term "Investigation" means the investigation conducted by the CFPB and referenced in its complaint filed against the Trusts in CFPB v. National Collegiate Master Student Loan Trust et al., No. 1:17-cv-01323-MN (D. Del.) (Dkt. 1).

5.      The term "Ambac" means Ambac Assurance Corporation.

6.      The term "Noteholders" refers to holders of Notes in the NCSLTs.

7.      The term "Notes" refers to the notes issued by the NCSLTs.

8. The term "NCSLTs" refer to the defendants, the fifteen Delaware statutory trusts referred to as the National Collegiate Student Loan Trusts, which are the National Collegiate Master Student Loan Trust, NCSLT 2003-1, NCSLT 2004-1, NCSLT 2004-2, NCSLT 2005-1, NCSLT 2005-2, NCSLT 2005-3, NCSLT 2006-1, NCSLT 2006-2, NCSLT 2006-3, NCSLT 2006-4, NCSLT 2007-1, NCSLT 2007-2, NCSLT 2007-3, and NCSLT 2007-4.

9. The term "Chaitman" refers to the law firm Chaitman LLP and its affiliates, member firms, assigns, predecessors, officers, directors, board members, employees, agents, representatives, partners, contractors and anyone else acting or purporting to act on Chaitman's behalf.

10. The term "DiCello Levitt & Casey" refers to the law firm DiCello Levitt & Casey LLC and its affiliates, member firms, assigns, predecessors, officers, directors, board members, employees, agents, representatives, partners, contractors and anyone else acting or purporting to act on DiCello Levitt & Casey's behalf.

11. The term "McCarter & English" refers to the law firm McCarter & English, LLP and its affiliates, member firms, assigns, predecessors, officers, directors, board members, employees, agents, representatives, partners, contractors and anyone else acting or purporting to act on McCarter & English's behalf.

12. The term "BPA" refers to Boston Portfolio Advisors, Inc. and its affiliates, assigns, predecessors, officers, directors, board members, employees, agents, representatives, partners, contractors and anyone else acting or purporting to act on BPA's behalf.

13. The term "VCG" refers to VCG Securities, LLC; VCG Owners Trust; VCG Special Opportunities Master Fund, Ltd.; NC Owners, LLC; NC Residuals Owners Trust; CeCe & Co. Ltd., LLC; Pathmark Associates, LLC; all employees, members, agents, consultants, and

5

all other persons acting or purporting to act on behalf of, or under the control of, each of the foregoing; Donald Uderitz; and Jorge Rodriguez-Lugo; and anyone else acting or purporting to act on VCG's behalf.

14.     The term "Proposed Consent Judgment" refers to the Consent Judgment that the CFPB submitted to the court for approval in the Action on September 18, 2017, and includes, without limitation, any prior drafts of the Proposed Consent Judgment as well as any prior drafts of any contemplated consent enforcement action against the NCSLTs.

15.     The term "Trust Related Agreements" refers to (1) agreements included within the definition of "Trust Related Agreements" set forth in the Trust Agreements, including the Trust Agreements, Indentures, and other agreements executed by the Owner Trustee; (2) agreements executed in reliance on agreements executed by the Owner Trustee (such as the McCarter & English retention letter), and (3) any "Basic Documents" as that term is defined in the Indentures, including servicing agreements.

16.     The term "Threshold Issues" refers to those Threshold Issues set out in the scheduling order dated November 29, 2018 entered in this Action (Dkt. 99).

17.     The term "Document" is coextensive with the use of that term in Federal Rule of Civil Procedure 34(a).

18.     "Concerning" or "concern" mean in any way, directly or indirectly, constituting, alluding to, commenting on, comprising, considering, constituting, describing, discussing, evidencing, identifying, mentioning, pertaining to, referring to, regarding, relating to, relevant to, representing, showing, suggesting, underlying, or otherwise involving the subject matter of the specified topic.

19.     The words "and," "or," and "any" shall be construed as necessary to bring within the scope of these topics any information that otherwise might be construed to be outside the scope of any of them.

20.     The words "including," "include," or "includes" are used in their broadest sense and are not meant to be limiting.  Any list following these terms contains illustrative examples of the types of information covered by the above-listed topics, but the list is without limitation and does not constitute an exclusive, all-encompassing, or exhaustive listing of all information covered by each the topic.

21.     Use of a singular noun shall be construed to include the plural noun, and use of a plural noun shall be construed to include the singular noun.

22.     The use of a verb in any tense shall be construed as the use of that verb in all other tenses whenever necessary to bring within the scope of the topics information that might otherwise be construed to be outside their scope.

## III. INSTRUCTIONS

1.     Unless explicitly stated otherwise in a particular Request, the period covered by these Requests is January 1, 2011 to the present.

2.     In responding to the Requests, furnish all responsive documents that are available to you, including documents in the possession of your subsidiaries, affiliates, parent companies, agents, advisors, attorneys, representatives or anyone else acting on your behalf or otherwise subject to your control.

3.     In responding to the Requests, make a diligent search of your records, electronic files and of any other papers and materials in your possession or available to your representatives. In the event that you are able to provide only part(s) of the document(s) called

7

for in any particular Request, provide all document(s) that you are able to provide and state the reason, if any, for the inability to provide the remainder.

4.      When a request uses one of the terms defined above, the definition is incorporated by reference.

5.      If Chaitman perceives any ambiguity in construing a request, set forth (1) the language Chaitman considers ambiguous, (2) the interpretation used by Chaitman in responding to the request, and (3) whether Chaitman has withheld documents on the basis of its interpretation.  No document should be withheld on the basis of a grammatical parsing of any request (e.g., the tense of a verb, the use of the plural instead of the singular, the use of "and" instead of "or").

6.      If any responsive document is subject to destruction under any document retention or destruction policy, the document should be exempted from any scheduled destruction until the conclusion of this litigation or otherwise permitted by the Court.

7.      If Chaitman is aware of any responsive documents that once existed but now have been destroyed, discarded, or otherwise cannot be found, then Chaitman's response must identify the following information for each document: (1) the last-known custodian of the document; (2) whether the document was destroyed, discarded, or lost; (3) the date on which the document was destroyed, discarded, or lost; (4) the manner in which the document was destroyed or discarded; (5) the reasons for destroying or discarding the document; (6) the person who authorized or carried out the act of destroying or discarding the document; (7) any efforts made to retrieve the document; and (8) a description of the document, including a summary of its contents, the name and title of its author, and the names and titles of any person who reviewed the document or had knowledge of its contents.

8.      If any document is withheld under a claim of privilege or the attorney work-product doctrine, provide the following information:

      a.   A description of the subject matter of the document, the title of the document, the type of document (e.g., memorandum, letter, report), and the names and titles of the author, addressee, and any other recipients.  In addition to providing their names and titles, identify whether each person is an attorney.

      b.   An identification of which privilege or protection applies and the basis for claiming the privilege or protection.

9.      If only a portion of a responsive document is privileged against disclosure, you must produce the responsive non-privileged portion of the document in redacted form, provided that the redacted material is identified and the basis for the claim of privilege stated.

10.      Each Request calls for the production of electronically stored information ("ESI") associated with responsive documents and any ESI that is otherwise responsive. Unless otherwise agreed, ESI shall be produced in compliance with the Data Delivery Standards annexed hereto as Exhibit 1.

11.      The Requests are not intended to be duplicative.  All Requests should be responded to fully and to the extent not covered by any other individual Requests.

12.      Chaitman has a continuing obligation to supplement its responses and its production if it obtains or becomes aware of additional documents after the date of its initial responses.

# Exhibit 1 – Data Delivery Standards

Electronically Stored Information ("ESI") must be produced in the form in which it is ordinarily maintained or in a form that is reasonably usable.

The use of file de-duplication methodologies in preparing productions is becoming more commonplace.  If your production will be de-duplicated it is vital that you 1) preserve any unique metadata associated with the duplicate files, for example, custodian name, and, 2) make that unique metadata part of your production.

In the event produced files require the use of proprietary software not commonly found in the workplace, Plaintiff will explore other format options with the producing party.

## ESI Production Specifications

1.  ESI should be produced as Group IV, 300 DPI, single-page TIFF images.  File names cannot contain spaces.

    Documents that can not be converted to Tiff (video, audio, applications, etc.) should be produced in native format.  Also, documents that can become unwieldy when converted to Tiff (spreadsheets, databases, source code, large diagrams, etc.) should be produced in native format.  For documents produced natively, create a single page place holder sheet bearing the bates number, file name and file type of the document being produced.

    Plaintiff reserves the right to request native files for any produced document.

2.  An Opticon load file (OPT) must be provided.  The Opticon load file is a page level load file, with each line representing one image.

    Below is a sample:

    IMG00001,VOL01,D:\IMAGES\001\IMG00001.TIF,Y,,,3
    IMG00002,VOL01,D:\IMAGES\001\IMG00002.TIF,,,,
    IMG00003,VOL01,D:\IMAGES\001\IMG00003.TIF,,,,
    IMG00004,VOL01,D:\IMAGES\001\IMG00004.TIF,Y,,,2
    IMG00005,VOL01,D:\IMAGES\001\IMG00005.TIF,,,,

    The fields are, from left to right:
    - Field One – (IMG00001) – The page identifier
    - Field Two – (VOL01) – The volume identifier – not required
    - Field Three – (D:\IMAGES\001\IMG00001.TIF) – a path to the image to be loaded
    - Field Four – (Y) – Document marker – a "Y" indicates the start of a unique document.
    - Field Five – (blank) – Can be used to indicate box
    - Field Six – (blank) – Can be used to indicate folder
    - Field Seven – (3) – often used to store page count but not required

3. Extracted text of a document must be delivered on a document level.  All text for a single document should be contained within one file.  The name of the file should be the first page of the document (BEGDOC.txt).  If there are non-searchable electronic documents and the text cannot be extracted, Kasowitz requires OCR text be provided for those documents.

4. A Concordance\Relativity load file must be delivered with the requested fields and metadata as shown in the table below.  If specific fields cannot be provided for a particular document, the field should be left blank.  In the case of email, the email image will be the parent, and attachment(s) will be the child/children; email images/parents and attachments/children must be bates numbered consecutively and sorted by email image/parent followed by attachment/child.

The delimiters for the file must be as follows (Concordance default):

   Comma – ASCII character 20 (¶)
   Quote – ASCII character 254 (þ)
   Newline – ASCII character 174 (®)

| Field Name | Sample Data | Comment |
| --- | --- | --- |
| PRODBEG | ABC0000001 | First bates number of electronic document |
| PRODEND | ABC0000002 | Last bates number of electronic document |
| PRODBEGATT | ABC0000001 | First bates number of the first page in a parent/child email relationship |
| PRODENDATT | ABC0000010 | Last bates number of the last page in a parent/child email relationship |
| CUSTODIAN | John Doe | Owner of the email/document |
| FROM | John Doe | Sender of email |
| TO | Jane Doe Smith | Direct or Primary Recipient(s) of email (listed in To field |
| CC | Fred Murray | Secondary Recipient(s) of email (listed in CC field) |
| BCC | Jake Johnson | Blind Recipient(s) of email (listed in BCC field) |
| SUBJECT | This is a document | Subject line of email |
| DATE_SENT | 10/15/2007 | Date email was sent (MMDDYYYY) |
| TIME_SENT | 9:00 AM | Time email was sent |
| LINK | \NativeFiles\test.xls | Link to native file on the media received |

| FILE_EXTEN | PST (email); DOC (Word) | File extension of the email, attachment, or loose e-file |
|---|---|---|
| FILE_NAME | Document.doc, jdoe.pst | The file name of the email attachment or loose e-file |
| AUTHOR | John Doe | The author of the email attachment or loose e-file |
| DATE_CREATED | 10/15/2007 | The create date of the email attachment or loose e-file (MMDDYYYY) |
| DATE_MODIFIED | 10/15/2007 | The modified date of the email attachment or loose e-file |
| DATE_ACCESSED | 10/17/2005 | The last accessed date of the email attachment or loose e-file |
| PRINTED_DATE | 10/15/2006 | The date the document was last printed |
| ORIGINALFILEPATH | Smith.pst\Personal Folders\Inbox | The path to the email in the mailbox or loose e-file |
| FILESIZE | 125 | Size of file in KB |
| MD5HASH | 7E8D6F38A8BB6FD50279B274E2E11406 | MD5 Hash value of the file |

5. Plaintiff requires that the delivery be sent either electronically or on a CD, DVD, or external USB hard drive, whichever results in the least number of items.

**Hard Copy Collections**

1. Image files must be produced in Group IV, 300 DPI, single-page TIFF format.  File names cannot contain spaces.

2. A database load file (delimited text) must be produced with, at a minimum, the PRODBEG, PRODEND, BEGATTACH, and ENDATTACH.  The delimiters for the file must be as follows (Concordance default):

> Comma – ASCII character 20 (¶)
> Quote – ASCII character 254 (þ)
> Newline – ASCII character 174 (®)

3. OCR text must be delivered with all hard copy documents scanned into electronic form.  All text for a single document should be contained within one file.  The name of the file should be the first page of the document (PRODBEG.txt).

4. An Opticon load file (OPT) must be provided for hard copy productions.